**MITTMAN, Appellant,**

**v.**

**BAHLS et al., Appellees.**

[Cite as *Mittman v. Bahls,* 148 Ohio App.3d 109, 2002-Ohio-2808.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 01AP–763.

Decided June 4, 2002.

Alexander M. Spater, for appellant.

Lane, Alton & Horst and D. Wesley Newhouse, for appellees.

LAZARUS, Judge.

{¶ 1} Plaintiff-appellant, Paula Mittman, appeals from the June 5, 2001 judgment of the Franklin County Court of Common Pleas directing a verdict in favor of defendants-appellees, Stephen Bahls, Dean of the Capital University Law School, and Capital University, on her claims of age discrimination and retaliation. For the reasons that follow, we affirm the judgment of the trial court.

{¶ 2} Appellant, the director of the Capital University Law School Certified Legal Assistant Program, was a pioneer in the field of paralegal education. She began with the program in 1974, serving as the coordinator under the direction of a prominent local attorney. She assumed the role of director in 1982. Appellant was a strong and assertive advocate for the program, which was well regarded by the directors of other paralegal programs around the nation, and approved by the American Bar Association. During her 24-year tenure, appellant saw many deans come and go from the law school.

{¶ 3} Appellant, along with her assistant, Linda Gorsuch, had responsibility for managing all aspects of the program including recruiting students and faculty, registration, dealing with the faculty, counseling students, and placement.

{¶ 4} By 1994, when Dean Bahls arrived at Capital University Law School, the program, although still strong, was suffering from declining enrollment. Enrollment went from approximately 35–37 students in the 1980s to around 25

students in the early to mid-1990s, to 20 students in the August 1998 class. Dean Bahls was particularly concerned about the declining enrollment and a lack of marketing materials for the program. As far back as May 1995, Dean Bahls had expressed frustration about recruiting materials that he wanted appellant to develop.

{¶ 5} In February 1998, appellant sensed a "coolness" from the dean, that prompted her to seek out his criticism. On April 6, 1998, appellant and Dean Bahls met to discuss appellant's "self-evaluation." Appellant testified that Dean Bahls "had no criticism, and that the program was doing beautifully." Nevertheless, appellant admitted that "he did share other things."

{¶ 6} Among the other things Dean Bahls discussed with appellant were appellant's failure to complete the creation of marketing materials, her failure to increase enrollment, the need to attend career fairs, the need to explore the creation of a satellite program at the Dayton campus, the need to examine the establishment of a weekend program, and the need to use the board of advisors more effectively. Dean Bahls also expressed concern about remarks appellant had made at a graduation banquet.

{¶ 7} Prior to the April 6, 1998 meeting, appellant had initiated efforts to receive retirement benefits that she had been denied from her early years with Capital University. Dean Bahls was aware of appellant's efforts. Appellant also had a conversation prior to April 6 with Vice President Vernon Truesdale concerning financial projections for appellant's retirement account. Also before the April meeting, appellant had told Dean Bahls that he should learn as much as he could about the program because appellant might get hit by a truck or might retire. During the April 6, 1998 meeting, Dean Bahls asked appellant when she planned to retire. He also told her that he hoped she would stay for a very long time. Appellant did not ascribe any discriminatory animus to the question at the time.

{¶ 8} Appellant brought to the meeting a copy of a report she had sent to the American Bar Association without the dean's prior approval. Appellant did not believe that she needed to have the dean's approval prior to sending in the report. Her motive in showing him the report was to demonstrate how well the program was doing. In the report, appellant had responded to an inquiry about her salary level and benefits. Dean Bahls believed that appellant's response to the inquiry was inaccurate and reflected negatively on the program and the law school. Dean Bahls wrote a memo to appellant in which he ordered her to correct the report.

{¶ 9} Appellant was highly upset and distressed by the dean's memorandum. Appellant believed that she had been wrongly accused of intentionally submitting an inaccurate report that contained damaging information. Appellant responded

by writing a memo to Dean Bahls that she recognized as being "defiant, ugly, furious and angry." Appellant knew that, in sending the memo, she had "overstepped the boundary," that it could "be a trigger for his anger," and that she would have to "face the music."

{¶ 10} Dean Bahls responded by placing appellant on probation through August 1998 and giving her a memorandum that outlined specific measures appellant would have to take to correct her performance and behavior. On April 30, 1998, Dean Bahls, appellant, and Bobbie Glotzhober, Director of Support Services, met and discussed the memorandum. Appellant apologized and told Dean Bahls that she would do whatever she could to comply with his demands. Dean Bahls told appellant that, if the situation turned around, he would give her a contract in September that would extend her employment for the following year.

{¶ 11} During the summer of 1998, appellant worked on the areas of concern outlined in the memo. Appellant saw a counselor to help her with managing her anger, accepting and acting on criticism and supervision in the workplace, and working collaboratively with others in the workplace. Appellant found the counseling sessions to be helpful. Appellant worked on developing marketing materials and submitted lengthy memos to Dean Bahls outlining her activities and progress.

{¶ 12} In August, Dean Bahls discussed appellant's progress and his intention to extend appellant's probation with other administrators at the law school. Appellant met briefly with Dean Bahls in the hallway at the law school on August 6, 1998. The dean told appellant that he was "delighted" with her progress but that he also had some concerns. Appellant testified that she believed that Dean Bahls was going to restore her regular contract because he did not mention placing any conditions on the new contract. However, appellant also testified that Dean Bahls indicated to appellant that he intended to extend appellant's probationary contract.

{¶ 13} Appellant told her employee assistance counselor that she felt morally and ethically obligated to tell the dean that she had consulted with an employment attorney in June. Appellant made an appointment to meet with Dean Bahls on August 24, 1998.

{¶ 14} The meeting began well, but when appellant told Dean Bahls that she had consulted with an employment lawyer, he became angry. Appellant also told Dean Bahls that she believed that she might have been discriminated against because of her age. After the meeting, Dean Bahls told Bobbie Glotzhober that he was concerned that he would have more difficulty working directly with appellant because now he had her lawyer and university counsel to deal with.

{¶ 15} In September, Dean Bahls delivered to appellant an eight-month probationary contract with a strongly worded memorandum. The memo stated that appellant should regard her contract as "terminal" unless the dean determined that "you have (a) fully addressed the performance issues he has raised (b) your performance is acceptable in all material respects and (c) the program continues in its current form." The memo went on to specify what appellant was required to do in the next eight months, and concluded by noting that if appellant determined that she could not accept his supervision and work constructively as a colleague, the school was willing to pay for career counseling.

{¶ 16} Appellant asked for additional time to respond to the contract and memorandum because of religious holidays. Dean Bahls agreed. On September 29, 1998, appellant responded with a strongly worded memorandum of her own that she characterized as defiant and defensive.

{¶ 17} On September 30, 1998, appellant had her counsel send a letter by facsimile to appellees' counsel rejecting the offered contract and proposing that appellant stay through December and receive three years' salary and benefits. In the letter, appellant claimed that she was being set up to fail and to be constructively discharged.

{¶ 18} Appellant continued to work after rejecting the contract and flew to Phoenix as planned to attend a conference. University counsel and appellant's counsel then exchanged a series of letters in which appellant took the position that, just because she had rejected the contract, it did not mean that she was no longer employed, and the university took the position that she was no longer an employee of Capital University. Eventually, Dean Bahls directed Linda Gorsuch, appellant's assistant, to tell appellant to vacate her office and remove her belongings.

{¶ 19} Dean Bahls appointed Linda Gorsuch as acting director, and, eventually, replaced appellant, who was 59 years old, with Mary Ming, who was 39 years old.

{¶ 20} On February 8, 1999, appellant filed suit against appellees, alleging that appellees harassed appellant and subsequently terminated her from her position on account of her age and sex, and in retaliation for opposing discriminatory acts and for contacting an attorney to assist her with her employment dispute with Capital University. Appellant's complaint also included a claim for intentional infliction of emotional distress.

{¶ 21} Appellees filed a motion for summary judgment on January 3, 2000. After oral argument on July 14, 2000, the trial court granted the motion in part and denied it in part on September 27, 2000.

{¶ 22} The age discrimination and retaliation claims proceeded to a jury trial on May 7, 2001. At the close of appellant's case, appellees moved for a directed verdict pursuant to Civ.R. 50(A) contending, as they had in the motion for summary judgment, that appellant had not proven the necessary elements for establishing either a claim of age discrimination or a claim of retaliation. The trial court agreed and granted appellees' motion for directed verdict. The trial court found that appellant had rejected her contract of employment, had failed to establish that she had been constructively discharged, and had failed to present direct evidence of age discrimination. With respect to the claim of retaliation, the trial court found that, after appellant hired a lawyer to represent her, Dean Bahls decided to refer the matter to Capital University's in-house counsel, and that the decision was entirely appropriate.

{¶ 23} On appeal, appellant has asserted the following assignments of error:

{¶ 24} "First Assignment of Error—The trial court erred in holding that plaintiff did not present evidence that defendants retaliated against her for opposing defendants' discriminatory practices, in violation of O.R.C. 4112.02(I).

{¶ 25} "Second Assignment of Error—The trial court erred in holding that plaintiff did not present evidence that defendants terminated her in retaliation for obtaining legal representation.

{¶ 26} "Third Assignment of Error—The trial court erred in finding that plaintiff did not prove a prima facie case of age discrimination."

{¶ 27} In her first and second assignments of error, appellant argues that she presented sufficient evidence to withstand a motion for a directed verdict on her claim that appellees retaliated against her for opposing discriminatory practices and for contacting an attorney. In *Gibson v. Drainage Products, Inc.*, 95 Ohio St.3d 171, 2002–Ohio–2008, 766 N.E.2d 982, at ¶ 19–21, the Supreme Court of Ohio recently reiterated the standard for granting or denying a motion for a directed verdict. The *Gibson* court stated:

{¶ 28} "{¶ 19}Civ.R. 50(A)(4) provides:

{¶ 29} "{¶ 20}'When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶ 30} "{¶ 21}'By the same token, if there is substantial competent evidence to support the party against whom the motion [for directed verdict] is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied. *Kellerman v. J.S. Durig Co.* (1964), 176 Ohio St. 320 [27 O.O.2d

241], 199 N.E.2d 562.' *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115, 4 O.O.3d 243, 363 N.E.2d 367. As we stated in *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, '[i]t is the duty of a trial court to submit an essential issue to the jury when there *is* sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue, or, conversely, to withhold an essential issue from the jury when there *is not* sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue.' (Emphasis sic.) Id., paragraph four of the syllabus. Moreover, the party against whom the motion is directed is entitled to have the trial court construe the evidence in support of its claim as truthful, giving it its most favorable interpretation, as well as having the benefit of all reasonable inferences drawn from that evidence. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68, 23 O.O.3d 115, 430 N.E.2d 935."

{¶ 31} Ohio law prohibits retaliating against an employee who has opposed any unlawful discriminatory practice under R.C. 4112.01 through 4112.07. R.C. 4112.02(I). To prove a claim of retaliation, an appellant must establish three elements: (1) that she engaged in protected activity, (2) that she was subjected to an adverse employment action, and (3) that a causal link exists between a protected activity and the adverse action. *Peterson v. Buckeye Steel Casings* (1999), 133 Ohio App.3d 715, 727, 729 N.E.2d 813. Once an appellant successfully establishes a prima facie case, it is the defendant's burden to articulate a legitimate reason for its action. Id. If the defendant meets its burden, the burden shifts back to the appellant to show that the articulated reason was a pretext. Id. The adverse action need not result in pecuniary loss but must materially affect appellant's terms and conditions of employment. Id. Factors to consider when determining whether an employment action was materially adverse include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Id. A change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Kocsis v. Multi–Care Mgt., Inc.* (C.A.6, 1996), 97 F.3d 876, 886.

{¶ 32} With these standards in mind, we examine the evidence before the trial court. In this case, appellant contends that appellees terminated her employment after a conversation on August 24, 1998, in which she told Dean Bahls that she had contacted an attorney and that she believed he had discriminated against her on account of her age. Appellant points to evidence that, immediately after she made those statements, Dean Bahls became angry, that, shortly thereafter, he gave her an onerous probationary contract, and that ultimately he fired her just a little over a month later.

{¶ 33} In this case, the bulk of the evidence supporting the motion for directed verdict came from appellant's own testimony. Construing the evidence most strongly in favor of appellant, we find that reasonable minds can only conclude that appellant failed to demonstrate a causal connection between the protected activity and the allegedly retaliatory conduct. The uncontroverted evidence at trial showed that, prior to August 24, 1998, the date appellant informed Dean Bahls that she thought he might be discriminating against her on account of her age and that she had contacted an attorney, Dean Bahls had already placed appellant on probation, and had already decided to extend her period of probation until the end of the academic year.

{¶ 34} At a dean's council meeting in August, Dean Bahls and Assistant Dean Linda Mihely had discussed appellant's probationary contract and Dean Bahls indicated to Mihely that he had decided to extend the probationary contract to give appellant additional time to address the performance issues in the first probationary contract. On August 6, 1998, Dean Bahls met briefly with appellant and informed her that he was pleased with the progress she had made, but that he still had some concerns. Therefore, he intended to extend her probationary contract. Not until after he had made this decision did appellant inform Dean Bahls that she had consulted with an attorney and believed that he might be discriminating against her. Thus, appellant failed to establish a causal connection between her complaints of discrimination and her contacting an attorney and the decision to extend appellant's probation.

{¶ 35} Moreover, appellant failed to establish that appellees terminated her from her position. Reasonable minds could only conclude that, on September 30, 1998, appellant, through her attorney, rejected appellees' offer to extend her probationary contract of employment. At that point, appellees had no further obligation to offer additional terms or to accept appellant's counteroffer or settlement proposal that she would continue working approximately three more months through the end of the calendar year and would receive salary and benefits for three additional years.

{¶ 36} In *Foster v. Ohio State Univ.* (1987), 41 Ohio App.3d 86, 534 N.E.2d 1220, Ohio State University ("OSU") offered plaintiff a contract of employment commencing July 1, 1983, and prescribing that plaintiff's signed acceptance must be received by June 2, 1983. Plaintiff responded by telephone purporting to accept the offer effective July 15, 1983. On June 7, 1983, OSU notified plaintiff that, since he had failed to accept in writing by June 2, the offer was revoked. On June 11, plaintiff signed the letter notifying OSU of his acceptance.

{¶ 37} This court held that plaintiff's reply, which purported to accept the contract for employment but was conditional on OSU's assent to different terms, was not an acceptance but a counteroffer, the effect of which was to rescind the

original offer. Id. at 88, 534 N.E.2d 1220. Thus, as with the case of appellant, plaintiff had simply failed to accept the terms of the offer and, therefore, no contract was formed. Id. When an offer is rejected, as it was here, it ceases to exist, and a subsequent attempted acceptance is inoperative to bind the offeror. *Garrison v. Daytonian Hotel* (1995), 105 Ohio App.3d 322, 325, 663 N.E.2d 1316.

{¶ 38} Appellant testified that she had rejected contracts in the past and believed that Capital University would negotiate with her this time. Appellant's beliefs notwithstanding, her own testimony and exhibits established that she chose to reject appellees' offer, and therefore no contract of employment was formed, no offer remained outstanding, and appellees were under no obligation to alter the terms of their original offer.

{¶ 39} Appellant also argues that, when she declined to accept the second probationary contract, her status changed to that of an at-will employee. Appellant presented evidence, through the testimony of Interim President Volpe, that the practice at Capital University was to contact an administrator who did not sign his or her contract to determine whether he or she wanted to remain at the university. This argument fails because it ignores the specific evidence relevant to appellant's employment situation. Appellant signed a probationary contract of employment that was set to expire on September 30, 1998, unless Dean Bahls determined that appellant had fulfilled the conditions of her probation, and he extended to her a further contract. Dean Bahls did indicate a willingness to continue the employment relationship, but with probationary terms. Appellant was dissatisfied with the terms of the contract and, through her attorney, specifically rejected the contract. Appellant did not simply decline to sign a proffered contract. Once she rejected the contract, her term of employment came to an end, and evidence of past practices of the university cannot transform her status as an employee for a term to an employee at will. See *Kashif v. Cent. State Univ.* (1999), 133 Ohio App.3d 678, 684, 729 N.E.2d 787 (concepts of employment at will and employment for a term under an express contract are mutually exclusive).

{¶ 40} Nor can appellant establish a constructive discharge. The Supreme Court of Ohio set forth the test for proving constructive discharge in *Mauzy v. Kelly Services, Inc.* (1996), 75 Ohio St.3d 578, 664 N.E.2d 1272. In *Mauzy*, the Supreme Court of Ohio reversed a trial court's grant of summary judgment concluding that it was improperly granted because of the existence of genuine issues of material fact over whether an employee had been constructively discharged because of her age. In so doing, the court set forth the following test for proving constructive discharge: "The test for determining whether an employee was constructively discharged is whether the employer's actions made working conditions so intolerable that a reasonable person under the circum-

stances would have felt compelled to resign." *Mauzy,* at paragraph four of the syllabus. In applying this test, "* * * courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent. They recognize that there is no sound reason to compel an employee to struggle with the inevitable simply to attain the 'discharge' label. No single factor is determinative. Instead, a myriad of factors are considered, including reductions in sales territory, poor performance evaluations, criticism in front of coemployees, inquiries about retirement intentions, and expressions of a preference for employees outside the protected group. * * *" *Mauzy* at 589, 664 N.E.2d 1272.

{¶ 41} In the instant case, appellant initially was placed on probation until September 30, 1998, and given specific measures to take to correct her behavior and performance problems. In the April 14, 1998 memorandum, Dean Bahls informed appellant that, in September, he would "determine whether your performance has improved sufficiently to justify further renewal." Appellant complied with some of the directives and attempted to comply with others. She made progress, but had not fully completed all the tasks set forth in the April 14 memo. In his September 18, 1998 memorandum, Dean Bahls noted that appellant had improved her job performance in some areas, praised appellant for "a good first step" in developing a marketing plan, but noted that appellant still had tasks to complete and areas where she needed to improve.

{¶ 42} In the September 18, 1998 memo, Dean Bahls asked appellant to continue to work with her employee assistance counselor through at least December. The university was paying for the sessions, and appellant testified that they were beneficial. Dean Bahls noted that appellant had developed a marketing plan and was working on developing a website. He gave specifics that he wanted addressed and asked her to finalize the materials by the end of October and to begin implementing the plan. He asked her to develop a proposal for a day program and offered the assistance of another employee to help prepare a business plan. Dean Bahls asked appellant to tell him what her normal office hours were and to spend 40 hours per week in the building. Since appellant testified that she usually worked between 45 and 70 hours per week, such a request would not appear burdensome to a reasonable person. Dean Bahls asked appellant to seek out an associate dean to assist her with time-management issues. He asked her to provide him with copies of all mailings from the American Bar Association and to discuss contacts with them prior to making those contacts. He offered to provide the necessary resources to help appellant address the performance issues outlined in the memo.

{¶ 43} Appellant responded to the decision to give her more time to complete the tasks she had been assigned in April by writing a memorandum that she

characterized as "defiant and defensive," and by rejecting the offer of a continued probationary contract.

{¶ 44} Part of an employee's obligation to be reasonable is an obligation not to assume the worst and not to jump to conclusions too fast. *Jackson v. Champaign Natl. Bank & Trust Co.* (2000), Franklin App. No. 00AP–170, 2000 WL 1376534, quoting *Garner v. Wal–Mart Stores, Inc.* (C.A.11, 1987), 807 F.2d 1536, 1539. Other than her attorney's statement in the letter rejecting the contract that Dean Bahls was requiring "[appellant] to perform tasks that one person can not possibly perform and that can not be done without a substantial infusion of cash," appellant presented no evidence that the proffered probationary contract was onerous or that her termination was objectively imminent. Appellant has failed to establish constructive discharge. The first and second assignments of error are not well taken and are overruled.

{¶ 45} In her third assignment of error, appellant argues that the trial court erred in ruling that she failed to establish a prima facie case of age discrimination.

{¶ 46} A plaintiff may establish a prima facie case of age discrimination by providing either direct evidence of discrimination or by the indirect method. In *Mauzy*, the Supreme Court of Ohio clarified certain aspects of the requirements for establishing a prima facie case of age discrimination. In *Mauzy*, the court held that "a plaintiff may establish a prima facie case of age discrimination directly by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent." Id. at paragraph one of the syllabus. In *Byrnes v. LCI Communication Holdings Co.* (1996), 77 Ohio St.3d 125, 672 N.E.2d 145, the court further stated that, when relying upon direct evidence, "an employee must prove a causal link or nexus between evidence of a discriminatory statement or conduct and the prohibited act of discrimination to establish a violation." Id. at 130, 672 N.E.2d 145. "Absent some causal connection or link between an employer's discriminatory statements or conduct and a plaintiff-employee, there is no permissible inference that the employer was motivated by discriminatory animus to act against the plaintiff-employee." Id.

{¶ 47} On appeal, appellant points to a question that Dean Bahls asked her at their April 6 meeting as to when she planned to retire, and appellant's own opinion that Dean Bahls favored younger employees in their twenties with no experience. However, appellant has not argued that she established a prima facie case of age discrimination through direct evidence; rather, she contends that she presented sufficient evidence of a circumstantial case of age discrimination.

{¶ 48} A plaintiff may establish a prima facie case of age discrimination by the indirect method by following the standard established in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. That analysis requires a plaintiff to demonstrate "(1) that he was a member of the statutorily protected class, (2) that he was discharged, (3) that he was qualified for the position, and (4) that he was replaced by, or that his discharge permitted the retention of, a person not belonging to the protected class." *Barker v. Scovill, Inc.* (1983), 6 Ohio St.3d 146, 6 OBR 202, 451 N.E.2d 807, paragraph one of the syllabus. But, see, *O'Connor v. Consol. Coin Caterers Corp.* (1996), 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (holding that a requirement that the plaintiff be replaced by someone under 40 years of age was not an element needed to establish a prima facie case of age discrimination).

{¶ 49} In the instant case, the parties do not dispute that appellant met three of the elements of a prima facie case of age discrimination: appellant was a member of a protected class (age 59); she was qualified for the position; and she was replaced by a person who was not in the protected class (Mary Ming, age 39). The trial court held, however, that appellant failed to show that she was terminated from her position. We agree.

{¶ 50} As discussed previously, reasonable minds could only conclude that appellant was not terminated, but, instead, unequivocally rejected the offer of a contract of employment and failed to provide any evidence of constructive discharge. Consequently, appellant failed to establish a prima facie case of age discrimination by the indirect method. Appellant's third assignment of error is not well taken and is overruled.

{¶ 51} Based on the foregoing, appellant's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

Judgment affirmed.

PEGGY BRYANT and PETREE, JJ., concur.